1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11    LA PALOMA GENERATING CO., LLC,        No.  1:15-cv-01280-MCE-JLT

12              Plaintiff,

13    v.                                     **MEMORANDUM AND ORDER**

14    MOJAVE PIPELINE CO., LLC, et al.,

15              Defendant.

16

17          Plaintiff La Paloma Generating Company, LLC ("Plaintiff") operates a natural-gas-

18    fired power plant (the "Plant") in Kern County.  It filed this lawsuit against Defendants

19    Mojave Pipeline Company ("Mojave"), El Paso Natural Gas Company, LLC ("El Paso"),

20    and Kern River Gas Transmission Co. ("Kern"), the owners of the pipeline through which

21    gas is delivered to the Plant ("Pipeline").  By way of this action, Plaintiff seeks to recover

22    damages for: (1) shutdowns and repairs necessitated by the delivery of allegedly

23    contaminated gas; and (2) a shutdown in the Plant's operations resulting from a sudden

24    drop in pressure in the Pipeline.  The operative First Amended Complaint ("FAC")

25    asserts two claims for breach of contract, one against El Paso and Mojave and one

26    against Kern, as well as an alternatively pleaded negligence claim against all

27    Defendants.

28    ///

1    Currently pending before the Court are Defendants' two Motions to Dismiss, one

2    brought jointly by Mojave and El Paso (ECF No. 31) and one brought individually by

3    Kern (ECF No. 32).  Both Motions raise the same general arguments.  Defendants first

4    contend that they were only contractually obligated to deliver merchantable gas to

5    Plaintiff's manager, EDF Trading North America, LLC ("EDF"), not to Plaintiff, and thus

6    Plaintiff's breach of contract claims fail as a matter of law.  In addition, Defendants argue

7    that they owed no duty of care to Plaintiff to ensure that the gas sold to EDF was

8    uncontaminated.  For the following reasons, Defendants Mojave and El Paso's Motion is

9    GRANTED without leave to amend and Defendant Kern's Motion is GRANTED without

10   leave to amend in part and DENIED in part.

11

12                            **BACKGROUND**[1]

13

14    The Plant consists of four independently operated sets of turbines and related

15   equipment fueled by natural gas transported through the Pipeline.  On December 13,

16   2012, Plaintiff entered into an Energy Management Agreement ("EMA") with EDF.  ECF

17   No. 28 at Exh. A.  The EMA obligated EDF to act as Plaintiff's energy manager.  More

18   specifically, pursuant to the EMA, EDF purchases gas from various third parties and

19   contracts with Defendants to have it shipped through the Pipeline to the Plant pursuant

20   to separate Transportation Services Agreements ("TSAs") with Defendants Kern,

21   Mojave, and El Paso.  Under the relevant TSAs, EDF nominates a volume of gas for

22   delivery to itself at the Plant.  EDF then sells that gas to Plaintiff in a separate

23   transaction.  Plaintiff and EDF also utilize the "California Pool," a service operated by

24   Defendant Kern in which a buyer can purchase gas available to be delivered to multiple

25   delivery points on the Kern pipeline system.  Plaintiff and Defendant Kern are directly

26   contractually bound through this Pooling Letter Agreement.  ECF No. 28-8.  Under the

27   Pooling Letter Agreement, EDF purchases or otherwise designates volumes of gas in

28   ───────────────
     [1] The following set of background facts is taken entirely from Plaintiff's FAC.

1   the California Pool to be delivered to the Plant.   EDF's nominations under the Pooling

2   Letter Agreement frequently accounted for more than 20% of the gas delivered by Kern.

3   See ECF No. 28 at Exh. K.

4         According to Plaintiff, the TSAs between EDF and Defendants provide a

5   framework for actual sales contracts for gas.  It follows, Plaintiff contends, that EDF's

6   nominations under the TSAs are separate, distinct, and enforceable contracts.

7   Importantly, Plaintiff emphasizes, EDF's nominations identified Plaintiff as the party that

8   would receive the gas.  EDF would then either make an equivalent volume of gas it

9   owned available to the Pipeline at a specified receipt point, or identify a volume of gas

10   already in the California Pool managed by Defendant Kern that could be made available

11   as well.  If it turned out that Plant operations required more gas than previously thought,

12   Plaintiff was permitted by certain Operational Balancing Agreements with Defendants to

13   draw more gas from the Pipeline than EDF had nominated for delivery.[2]

14         Aside from the technical delivery aspects of these nominations, Plaintiff alleges

15   that each nomination was an agreement between EDF and Defendants that incorporated

16   the General Terms and Conditions of the relevant Defendant's FERC tariff.[3]  Each of

17   these FERC tariffs required Defendants to provide "merchantable" natural gas—that is,

18   gas free from contaminating substances such as crude oil and dust.

19         Beginning in May 2014, turbines at the Plant began to experience issues

20   traceable to contaminated gas drawn from the Pipeline.  According to the FAC, the gas

21   delivered by Defendants was the only possible cause of these problems, which required

22   Plaintiff to drain hundreds of gallons of oil from the Plant's fuel gas scrubbers and which

23   resulted in approximately $3 million in damages.

24   ///

25         [2] Under this arrangement, Plaintiff was then of course required to arrange to have those additional

26   quantities of gas purchased to be delivered back into the Pipeline to balance the account.  The
     Operational Balancing Agreements and Plaintiff's Pooling Letter Agreement with Defendant Kern are the

27   only agreements that create direct contractual relationships between Plaintiff and any Defendant.

28         [3] A tariff is the means by which the Federal Energy Regulatory Commission regulates the
     interstate shipment of natural gas.

1    In addition to the above fuel contamination, Plaintiff alleges that Defendants failed

2  to deliver gas at the proper pressure for several hours on June 8, 2014.  This drop in

3  pressure allegedly caused the Plant to completely shut down, resulting in additional

4  damages of approximately $675,000.

5    As a result, Plaintiff initiated this action to recover for its economic injuries.  In its

6  original complaint, Plaintiff sought to recover from the current Defendants as well as

7  EDF.  The FAC, however, drops all claims against EDF and proceeds only against

8  Mojave, El Paso, and Kern.[4]  As it stands, Plaintiff seeks to recover from each of the

9  remaining Defendants alternatively under either its breach of contract or negligence

10  theories.  With one exception as to the Kern Pooling Agreement, all of these arguments

11  lack merit.

12

13                                    **STANDARD**

14

15    On a motion to dismiss for failure to state a claim under Federal Rule of Civil

16  Procedure 12(b)(6), all allegations of material fact must be accepted as true and

17  construed in the light most favorable to the nonmoving party.  Cahill v. Liberty Mut. Ins.

18  Co., 80 F.3d 336, 337-38 (9th Cir. 1996).  Rule 8(a)(2) "requires only 'a short and plain

19  statement of the claim showing that the pleader is entitled to relief' in order to 'give the

20  defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell

21  Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41,

22  47 (1957)).  A complaint attacked by a Rule 12(b)(6) motion to dismiss does not require

23  detailed factual allegations.  However, "a plaintiff's obligation to provide the grounds of

24  his entitlement to relief requires more than labels and conclusions, and a formulaic

25  recitation of the elements of a cause of action will not do."  Id. (internal citations and

26  _____

27    [4] For this reason alone, Plaintiff's argument that dismissal of its claims against Defendants would leave it without a remedy is specious.  Although Plaintiff may not be able to recover directly from Defendants for the damages it has sustained as a result of these events, it almost certainly may assert a

28  cause of action against EDF, even if it does not do so in this Court.

                                        4

1  quotations omitted).  A court is not required to accept as true a "legal conclusion

2  couched as a factual allegation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting

3  Twombly, 550 U.S. at 555).  "Factual allegations must be enough to raise a right to relief

4  above the speculative level."  Twombly, 550 U.S. at 555 (citing 5 Charles Alan Wright &

5  Arthur R. Miller, Federal Practice and Procedure § 1216 (3d ed. 2004) (stating that the

6  pleading must contain something more than "a statement of facts that merely creates a

7  suspicion [of] a legally cognizable right of action")).

8         Furthermore, "Rule 8(a)(2) . . . requires a showing, rather than a blanket

9  assertion, of entitlement to relief."  Twombly, 550 U.S. at 555 n.3 (internal citations and

10  quotations omitted).  Thus, "[w]ithout some factual allegation in the complaint, it is hard

11  to see how a claimant could satisfy the requirements of providing not only 'fair notice' of

12  the nature of the claim, but also 'grounds' on which the claim rests."  Id. (citing Wright &

13  Miller, supra, at 94, 95).  A pleading must contain "only enough facts to state a claim to

14  relief that is plausible on its face."  Id. at 570.  If the "plaintiffs . . . have not nudged their

15  claims across the line from conceivable to plausible, their complaint must be dismissed."

16  Id.  However, "[a] well-pleaded complaint may proceed even if it strikes a savvy judge

17  that actual proof of those facts is improbable, and 'that a recovery is very remote and

18  unlikely.'"  Id. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

19         A court granting a motion to dismiss a complaint must then decide whether to

20  grant leave to amend.  Leave to amend should be "freely given" where there is no

21  "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice

22  to the opposing party by virtue of allowance of the amendment, [or] futility of the

23  amendment . . . ."  Foman v. Davis, 371 U.S. 178, 182 (1962); Eminence Capital, LLC v.

24  Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (listing the Foman factors as those to

25  be considered when deciding whether to grant leave to amend).  Not all of these factors

26  merit equal weight.  Rather, "the consideration of prejudice to the opposing party . . .

27  carries the greatest weight."  Id. (citing DCD Programs, Ltd. v. Leighton, 833 F.2d 183,

28  185 (9th Cir. 1987)).  Dismissal without leave to amend is proper only if it is clear that

5

1    "the complaint could not be saved by any amendment."  Intri-Plex Techs. v. Crest Group,

2    Inc., 499 F.3d 1048, 1056 (9th Cir. 2007) (citing In re Daou Sys., Inc., 411 F.3d 1006,

3    1013 (9th Cir. 2005); Ascon Props., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir.

4    1989) ("Leave need not be granted where the amendment of the complaint . . .

5    constitutes an exercise in futility . . . .")).

6

7                            **ANALYSIS**

8

9       **A.**      **Plaintiff's Breach of Contract Claims**

10       As Plaintiff concedes, the only contracts with Defendants to which Plaintiff was

11    actually a party are the Operational Balancing Agreements and the Pooling Letter

12    Agreement with Kern.  While Plaintiff does assert that its direct relationship with Kern

13    through that Pooling Letter Agreement is sufficient to maintain a contract claim, the bulk

14    of its breach of contract arguments turn on indirect relationships: (1) that Defendants are

15    contractually liable to Plaintiff because EDF acted as Plaintiff's agent in nominating gas

16    for delivery to the Plant; and (2) that Plaintiff is a third-party beneficiary of the

17    nominations made by EDF.  The Court addresses each of these arguments in turn.

18                  **1.  Plaintiff's Agency Theory**

19       Plaintiff's first theory is that pursuant to the TSAs, EDF contracted with

20    Defendants as Plaintiff's agent for the delivery of natural gas to the Plant.  ECF No. 68,

21    75-76.  These agreements were purportedly made through the daily "nominations"

22    process, and incorporated Defendants' FERC Tariffs.

23       Plaintiff's own contractual relationship with EDF is then governed by the EMA.

24    Both Plaintiff and Defendants agree that New York law governs the EMA's interpretation.

25    Ordinarily, then, the question of whether EDF acted as Plaintiff's agent would be a

26    factual one.  E.g., Melito v. American Eagle Outfitters, Inc., No. 14-cv-2440, 2015 WL

27    7736547 at *6 (S.D.N.Y. Nov. 30, 2015).  On the other hand, when parties enter into a

28    contract, courts look to the language of the agreement to ascertain the nature of the

1  relationship.  EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 19-20 (N.Y. 2005).

2  Section 2.5 of the EMA provides that EDF may only act as either: (a) Plaintiff's

3  scheduling agent, and (b) as Plaintiff's limited agent, "subject to a written acceptance of

4  appointment and all necessary Third Party approvals, under the Related Agreements" to

5  which Plaintiff is a party.  ECF No. 28 at Exh. A.

6         Defendants argue that none of the above is sufficient to have established an

7  agency relationship between EDF and Plaintiff.  There is no reference in the EMA to the

8  TSAs between EDF and Defendants and no agreement where EDF was appointed as

9  Plaintiff's agent with respect to transactions governed by the TSAs.  Rather, Plaintiff

10 simply purchases gas from EDF.  When gas is delivered to the Plant by Defendants, it is

11 owned by EDF and sold by EDF to Plaintiff.  A buyer-seller relationship such as the one

12 between EDF and La Paloma rarely gives rise to a principal-agent relationship.  See

13 Crimson Semiconductor, Inc. v. Electronum, No. 84 Civ. 2124 (RLC), 1990 WL 186867

14 at *3 (S.D.N.Y. November 19, 1990) (explaining the difference between a buyer-seller

15 relationship and an agency relationship).  Plaintiff argues, however, that its relationship

16 with EDF under the EMA was not a typical buyer-seller relationship, and that the

17 question of whether EDF was acting as Plaintiff's agent is a question of fact that should

18 not be decided at the pleading stage.

19        In some instances, Plaintiff may be correct.  However, section 2.5 of the EMA

20 makes clear that Plaintiff appointed EDF as its agent in only a limited capacity.  This

21 limited agency appointment does not cover Plaintiff's claims here, and, in fact, section

22 2.5 expressly disclaims any broader interpretation of the agency relationship.  Although

23 the EMA does obligate EDF to use commercially reasonable efforts to optimize the

24 economic value of the EMA to Plaintiff, it does not appear that Plaintiff exercises any

25 control over EDF beyond telling it how much gas the Plant's operation requires on any

26 given day.  For example, the EMA does not give Plaintiff any right to control who EDF

27 initially purchases gas from, nor does the EMA give Plaintiff the right to accept or reject

28 any purchase or transportation agreement made by EDF.  Accordingly, the EMA is

structured so that EDF acts as an independent contractor that acquires and purchases gas for Plaintiff.   Plaintiff's agency theory of contractual liability therefore fails as a matter of law.

### 2. Plaintiff's Third-Party Beneficiary Theory

Plaintiff next alleges that it has contract claims against Defendants because it is a third-party beneficiary of the TSAs between EDF and Defendants.  Specifically, Plaintiff alleges that the nominations for gas deliveries made by EDF under the TSAs constituted separate contracts and that Plaintiff is the intended beneficiary of those contracts.  ECF No. 28 at ¶ 26; see also ECF No. 42 at 18:22-19:2.  The parties agree that Colorado law governs the TSAs between EDF and El Paso/Mojave, and Utah law governs the TSA between EDF and Kern.  Both Colorado and Utah law look to the written contract as well as the circumstances surrounding it to determine whether a party is a third-party beneficiary.  E.g., Salt Lake City Corp. v. ERM-West, Inc., No. 2:11-CV-1174, 2013 WL 4782286 at *3-4 (D. Utah Sept. 5, 2013); E.B. Roberts Const. Co. v. Concrete Contractors, Inc., 704 P.2d 859, 865 (Colo. 1985).

The critical question here is whether the daily nominations constitute separate contracts from the TSAs attached to the FAC.  If they do, then Plaintiff's contract claims will survive dismissal under a third-party beneficiary theory because Plaintiff alleges that Defendants were aware that the daily nominations for deliveries to the Plant were made specifically for Plaintiff's benefit.  ECF No. 28 at ¶ 29.  Indeed, the nominations themselves would have clearly indicated to Defendants that the contemplated natural gas would be transported to Plaintiff.

The Court nonetheless concludes that the daily nominations are not separate contracts.  As Defendants observe, the nominations do not contain contractual terms.  To the contrary, the nominations Plaintiff attached to the FAC are simply spreadsheets that list the delivery location and quantity for Plaintiff's gas deliveries.  ECF No. 28 at Exhs. K and L.  Furthermore, pursuant to the TSAs, EDF can nominate gas deliveries at dozens of locations along the Pipeline, including but not limited to deliveries to the Plant.

8

1    Finally, it appears that the nominations process is simply part of the course of

2    performance under the TSAs rather than a separate contractual arrangement.  See e.g.,

3    id. at Exh. D at ¶ 5 ("Shipper agrees to tender gas for transportation service and

4    Transporter agrees to accept receipt quantities . . . .").  The Operational Balancing

5    Agreements between the parties do not affect this analysis because they contain no

6    terms regarding the nomination, delivery, or quality of the gas.  Nor does Plaintiff make

7    any allegation by which the Operational Balancing Agreements could transform the daily

8    nominations made by EDF into separate, enforceable contracts.

9         Because the nominations made by EDF on Plaintiff's behalf do not constitute

10   contracts separate from the TSAs, Plaintiff's third-party beneficiary theory of contractual

11   liability also fails as a matter of law.

12                   **3.  The Kern Pooling Agreement**

13        Finally, Plaintiff contends that it has a direct contractual relationship sufficient to

14   support a breach of contract claim against Defendant Kern through the Pooling Letter

15   Agreement, which states that by using Kern's pooling service, Plaintiff agreed "to be

16   bound by the terms and conditions of Kern River's Tariff . . . that may reasonably be

17   interpreted to have application to pooling transactions."  ECF No. 28 at Ex. H.

18   Accordingly, if the gas quality provisions of Kern's FERC Tariff may be reasonably

19   interpreted to apply to pooling transactions, then Plaintiff may state a breach of contract

20   claim for deliveries of contaminated gas by Kern.

21        Kern argues that the gas quality provisions of its FERC Tariff are not applicable to

22   pooling transactions because the Pooling Letter Agreement does not provide for the

23   transportation of natural gas.  Instead, Kern contends that "the Pooling Agreement is

24   nothing more than a mechanism that allows La Paloma to aggregate natural gas

25   supplies from Shippers . . . before final delivery to the La Paloma Interconnect."

26        Kern's argument is unpersuasive, at least at this stage in the proceedings.  Here,

27   the FAC specifically alleges that the Pooling Letter Agreement incorporates the gas

28   quality provisions of Kern's FERC Tariff.  ECF No. 28 at ¶ 33.  It further alleges that Kern

1    was scheduled to deliver gas to the Plant on June 8, 2014, and the nominations

2    spreadsheet attached to the spreadsheet shows that at least some of those deliveries

3    were nominated from the California Pool.  ECF No. 28-11.  The Pooling Letter

4    Agreement is short, and is reasonably susceptible to both Plaintiff's and Kern's dueling

5    interpretations.  Accordingly, dismissal of Plaintiff's Second Cause of Action for breach of

6    contract against Defendant Kern is inappropriate on this Rule 12(b) motion.  See, e.g.,

7    Aguayo v. U.S. Bank, 653 F. 3d 912, 917 (9th Cir. 2011) ("A complaint must not be

8    dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in

9    support of the claim that would entitle the plaintiff to relief.").  Kern's Motion to Dismiss is

10   therefore DENIED with respect to that claim.  Both Motions to Dismiss the contract

11   claims are GRANTED without leave to amend in all other respects.

12   **B.  Third Cause of Action for Negligence**

13   Plaintiff's Third Cause of Action seeks to hold Defendants liable in negligence for

14   the contaminated gas and June 8 failure.  The FAC specifically alleges that Defendants

15   owed Plaintiff a duty of care to operate and maintain the Pipeline to ensure that the

16   quality of gas shipped through the pipeline was of commercially reasonable quality.  ECF

17   No. 28 at ¶ 82-83.

18   Defendants contend that they owe no common law duty of care to downstream

19   users of gas delivered through their pipelines.  Relying on a recent decision from the

20   District of Oregon (PacifiCorp v. Northwest Pipeline GP, 879 F. Supp. 2d 1171

21   (D. Or. 2012)), Defendants argue that the only "duty" they have is the contract-based

22   obligation in their FERC tariffs to provide merchantable gas to their direct customers.

23   The facts of PacifiCorp are similar to the facts of the instant case.  In PacifiCorp,

24   the plaintiff operated a natural gas power plant that sold electricity to retail customers.

25   Plaintiff PacifiCorp contracted with Defendant GTN to transport gas from Canada and

26   deliver it to the power plant.  The transportation agreement between PacifiCorp and GTN

27   incorporated the terms and conditions of GTNs FERC tariff.  Id. at 1177.  Defendant

28   Northwest would also ship gas through GTN's pipeline but did not have any contract in

1    place with PacifiCorp.  Eventually, gas contaminated by oil caused problems with the

2    power plants turbines, and PacifiCorp brought claims for breach of contract and

3    negligence against both Northwest and GTN.

4         In deciding cross motions for summary judgment, the Court dismissed all of

5    PacifiCorp's claims against Northwest.  The Court also dismissed PacifiCorp's

6    negligence claim against GTN.  In dismissing both sets of negligence claims, the Court

7    reasoned that the gas quality language in the FERC tariffs set forth a standard of

8    conduct that created a limited duty of care and obviated the need to analyze whether

9    injury resulting from a particular course of conduct was reasonably foreseeable.  The

10   Court held that Northwest's FERC tariff explicitly limited its duty concerning gas quality to

11   "gas delivered to a 'Shipper' at a 'Delivery Point.'"  Id. at 1185.  Furthermore, the Court

12   noted that allowing a negligence claim based on the Northwest FERC tariff would have

13   violated FERC authority holding that upstream gas transporters are only responsible for

14   ensuring gas quality at their tariff delivery points to their direct customers.  Id.

15   Accordingly, the Court rejected the plaintiff's attempt to "manufacture a negligence claim

16   against Northwest by expanding the scope of FERC tariffs to create a generalized duty

17   of care to all foreseeable downstream users, in contradiction to the tariff's express

18   terms."  Id.

19        Plaintiff and Defendants here are in a similar position to PacifiCorp and

20   Northwest.  Like PacifiCorp, Plaintiff seeks to create a duty of care out of the gas quality

21   standards in Defendants' FERC tariffs.  But as the PacifiCorp court recognized, allowing

22   Plaintiff to do so would contradict both the plain language of the tariffs that limit

23   Defendants' duty to Shippers and FERC authority holding that upstream gas

24   transporters are only responsible for ensuring gas quality at their tariff delivery points to

25   direct customers.  See ANR Pipeline Co., 116 FERC ¶ 61002, ¶ 61014 ("The

26   Commission accordingly finds that in setting a Safe Harbor CHDP, ANR must choose a

27   level that assures that it can make deliveries to downstream customers and that gas will

28   be accepted for delivery at the interconnects with those customers . . . .  However, the

1   Commission agrees with ANR and the producers that LDCs and other downstream

2   systems are responsible for the operating conditions on their systems." (emphasis

3   added)).  Here, the direct customer is EDF, not Plaintiff.

4           Plaintiff's arguments to the contrary are not persuasive.  Specifically, Plaintiff

5   argues that  its relationship with Defendants is more similar to the relationship between

6   PacifiCorp and GTN than it is to the relationship between PacifiCorp and Northwest.  But

7   in PacifiCorp, the plaintiff's relationship with GTN was direct—the Plaintiff specifically

8   contracted with GTN for the delivery of gas.  Here, in contrast, Plaintiff has no customer

9   relationship with any Defendant in this action other than with respect to the Kern Pooling

10  Letter Agreement.  As stated above, Plaintiff is free to maintain its claim for breach of

11  contract against Defendant Kern based on the Pooling Agreement.  But, Plaintiff cannot

12  manufacture a negligence claim based on Defendants' FERC tariffs.  Accordingly,

13  Plaintiff's Third Cause of Action for Negligence is DISMISSED without leave to amend.

14

15                                    **CONCLUSION**

16

17          For the reasons stated above, IT IS HEREBY ORDERED that:

18  1.  Defendants El Paso and Mojave's Motion to Dismiss (ECF No. 31) is

19       GRANTED in its entirety.  Plaintiff's First and Third Causes of Action are

20       DISMISSED without leave to amend.

21  2.  Defendant Kern's Motion to Dismiss (ECF No. 32) is GRANTED without leave

22       to amend with respect to Plaintiff's Third Cause of Action, and GRANTED

23       without leave to amend IN PART and DENIED IN PART with respect to

24       Plaintiff's Second Cause of Action.

25          IT IS SO ORDERED.

26  Dated:  March 3, 2016

27

28
                                    _____
                                    MORRISON C. ENGLAND, JR., CHIEF JUDGE
                                    UNITED STATES DISTRICT COURT